UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF TENNESSEE
AT GREENEVILLE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | NO. 2:10-CR-84(01) |
| | ) | |
| AARON KINZER | ) | |

**MEMORANDUM OPINION AND ORDER**

On August 10, 2010, the federal grand jury returned a seven count indictment charging Aaron Kinzer, Sandra Duff, Gary O'Neal, Jessica Light, and Johnny Lewis with conspiring to distribute and possess with the intent to distribute 50 grams or more of cocaine base ("crack"), conspiring to distribute and possess with the intent to distribute 50 kilograms or more of marijuana, and various other substantive drug offenses, [Doc. 3]. On May 11, 2011, the grand jury returned a nine count superseding indictment that added two additional counts and two additional defendants, Kevin Breckinridge and Mark Mole, [Doc. 113]. Then, on August 9, 2011, the grand jury returned a nine count second superseding indictment against the defendants, [Doc. 142].

Aaron Kinzer ("Kinzer") was charged in all counts of the second superseding indictment. He was charged in Count One with conspiracy to distribute and possess with the intent to distribute 28 grams or more of cocaine base in violation of 21 U.S.C. §§ 846, 841(a)(1) and 841(b)(1)(B); in Count Two, he was charged with conspiracy to distribute and possess with the intent to distribute 50 kilograms or more of marijuana in violation of 21 U.S.C. §§ 846, 841(a)(1) and 841(b)(1)(C); in Count Nine, he was charged with conspiracy to commit money laundering in violation of 18 U.S.C. § 1956(h); in the remaining counts, Kinzer was charged with various

1

other drug offenses. On July 25, 2012, Kinzer pled guilty, pursuant to a negotiated plea agreement, to Counts One, Three, and Nine of the second superseding indictment.

A presentence investigation report ("PSR") was prepared by a United States probation officer. The probation officer grouped counts One, Two and Nine pursuant to USSG § 3D1.2(c). (PSR, ¶ 31). The probation officer applied a career offender enhancement as provided USSG § 4B1.1 because Kinzer was at least 18 years old at the time of the instant offenses of conviction, the instant offenses are controlled substance offenses, and the defendant has at least two prior felony convictions for a controlled substance offense. (PSR, ¶ 38). The probation officer identified three prior felony controlled substance offenses as predicate offenses for career offender purposes: (1) conviction on June 16, 2006 for possession of marijuana with intent to distribute more than one-half ounce, but less than five pounds, in the Circuit Court for Bristol, Virginia (case number CR-06807801 & 02), (2) a conviction on March 29, 2007 for possession of marijuana with intent to distribute in the Circuit Court for Bristol, Virginia (case number CR070839001), and (3) possession of marijuana with intent to distribute on January 25, 2010 in Jackson County Superior Court, Jefferson, Georgia. As a result, the probation officer calculated advisory guidelines range of 262 to 367 months of imprisonment.

Although Kinzer admits each of the prior convictions, he objects to the application of the career offender enhancement. More specifically, Kinzer argues that each of the prior convictions "involved relevant conduct associated with the conspiracies in this cause," [Doc. 292 at 2], and that "his prior convictions are related and should be considered one sentence for sentencing purposes as they resulted from a continuing and uninterrupted common scheme or plan." [*Id*. at 3]. In short, Kinzer argues that he has been "a drug dealer for many, many years" and "that his activities associated with the state convictions (and conspiracy convictions) in the instant case

2

constitute a common scheme or plan and the same course of conduct," *i.e.* "an ongoing series of interrelated events." [*Id.*].

An evidentiary hearing was held on January 27, 2014, at which the Court heard testimony from the defendant and from the case agent, DEA Task Force Agent Mike Commons. The parties have now been fully heard on the matter, briefs have been filed, [Docs. 292, 293, 306, 307], and the matter is ripe for decision. For the reasons which follow, the Court finds that defendant is a career offender and his objection to the PSR is OVERRULED. As a result, his advisory guidelines range is 262 to 327 months of incarceration.

The following facts are stipulated to by Kinzer as part of his plea agreement:

> 4. In support of the defendant's guilty plea, the defendant agrees and stipulates to the following facts, which satisfy the offense elements. These are the facts submitted for purposes of the defendant's guilty plea. They do not necessarily constitute all of the facts in the case. Other facts may be relevant to sentencing. Both the defendant and the United States retain the right to present additional facts to the Court to ensure a fair and appropriate sentence in this case.
>
> a) On September 15, 2009, in the Eastern District of Tennessee, the Sullivan County Tennessee Sheriff's Office conducted a controlled buy, utilizing a confidential informant ("CI") to purchase a half pound of marijuana from the defendant for $600. The purchase took place at the defendant's business, First Class Auto, at 305 Beechwood Ave., Bristol, Tennessee.
> b) On September 17, 2009, the Sullivan County Sheriff's Office again made a controlled purchase of marijuana from the defendant, utilizing the CI to purchase a half pound of marijuana for $900. This purchase took place at the residence of the defendant and co-conspirator Sandra Duff at 251 Basham Hill Road, Bristol, TN.
> c) On September 25, 2009, the Sullivan County Sheriff's Office made a third controlled buy from The defendant, utilizing the CI to purchase a half pound of marijuana for $650 at the defendant's business. A forensic analysis of the marijuana purchased during the three controlled buys established that the substance was in fact marijuana and the weights of the marijuana

3

purchased on the foregoing dates as 220.5 grams, 215.1 grams, and 222.2 grams, respectively.

    d) On June 5, 2009, a state search warrant was executed by the Sullivan County Sheriff's Office, at the residence of the defendant and Sandra Duff in Bristol, Tennessee. During the search, officers located a bag containing 1.2 grams of marijuana, a marijuana cigarette, a marijuana crusher, and $1,000 in cash representing proceeds from the sale of marijuana. The defendant and co-conspirator Sandra Duff were arrested and charged in state court with possession of marijuana and maintaining a dwelling where narcotics were stored.

    e) On October 16, 2009, the Sullivan County Sheriff's Office executed a search warrant at the residence of the defendant and Sandra Duff. Both the defendant and Duff were present. During the search, several baggies containing marijuana were located. $2,000, representing proceeds from the sale of marijuana, was located inside a bag in the master bedroom closet. Both the defendant and Duff were arrested and charged in state court with marijuana trafficking.

    f) Also on October 16, 2009, in the Eastern District of Tennessee, a search warrant was executed at First Class Auto located at 305 Beechwood Drive, Bristol, Tennessee. First Class Auto is the business of the defendant. A K-9 officer took a drug-detecting canine through the business, with the dog alerting on several places, including a car in the garage area. A bag was located in the back of a white Oldsmobile in the garage, containing two large sandwich bags containing cocaine base ("crack") and a blue baggie containing cocaine base ("crack"). Digital scales with residue and baggies were also located in the white Oldsmobile. Another blue baggie containing cocaine base ("crack") was found in the garage. A black funnel was hanging on the wall containing baggies with the corners cut-off. The cocaine base ("crack") from the searches was sent to the DEA lab, where it tested positive as cocaine base ("crack"), with the total weight being 146.9 grams.

    g) After his arrest on October 16, 2009, the defendant made numerous recorded phone calls from the jail, where he was incarcerated, to co-conspirator Mark Mole, who assisted the defendant in the collection of money owed to the defendant for the sale of cocaine base ("crack") and marijuana, and otherwise continued the defendant's business of obtaining and selling cocaine base ("crack") and marijuana during the defendant's incarceration, including making trips to the Charlotte, North Carolina and Atlanta, Georgia areas to deal with illegal narcotics suppliers, including co-conspirator Kevin Breckenridge. During the phone conversations, Mole and the defendant also discussed the laundering of the proceeds of illegal narcotics sales, with the

defendant telling Mole about money sent by wire transfer to a narcotics supplier, co-conspirator Kevin Breckenridge.

h) On March 7, 2010, an Iredell County, North Carolina Sheriff's Deputy stopped a 1997 Chevrolet Lumina, registered to the defendant. The occupants were co-defendants Jessica Light and Johnny Lewis. Both indicated they were traveling to Charlotte from Bristol, Tennessee. The occupants consented to a search of the vehicle, which revealed $10,460 in cash packed into a Victoria's Secret bag, hidden in the back of the glove compartment. The cash was packaged into 10 separate bundles and rubber banded. Lewis indicated ed that they were to pick up marijuana in Charlotte for the defendant. Lewis further indicated that this was their fourth trip to Charlotte for the defendant. Lewis stated that when they would get close to a particular exit ramp, they could call the defendant and the defendant would call the source of supply for the marijuana. That source of supply was co-defendant Kevin Breckenridge. Breckenridge would then show up in a red Jaguar, pick up the money and leave. Then, 15 to 20 minutes later, Breckenridge would return and put either a duffel bag or trash bag into the truck of the defendant's car.

i) Lewis and light additionally made trips to Atlanta for the defendant, where they would obtain cocaine base "crack" for resale by the defendant. On each occasion, Lewis and Light picked up a large box containing cocaine base "crack."

j) Co-defendant Gary O'Neal also made multiple trips to the Charlotte, North Carolina area to obtain marijuana from Kevin Breckenridge for the defendant. On each occasion, O'Neal would obtain from two to five pounds of marijuana. O'Neal also traveled to the Atlanta, Georgia area to pick up cocaine base "crack" for the defendant.

k) From April of 2009 to January of 2010, the defendant also wired approximately $28,600 in U.S. currency to co-conspirators via Money Gram. The defendant admits that he knew this money was from the sale of illegal narcotics and that he was conspiring to promote the continued sale of marijuana and cocaine base "crack."

l) In total, the defendant admits responsibility for at least 50 kilograms, but less than 60 kilograms of marijuana, and at least 196 grams, but less than 280 grams of cocaine base "crack."

m) In the Superior Court of Jackson County, Georgia in case number A08CR0304, the defendant was convicted of the possession of marijuana with the intent to distribute, on January 25, 2010.

n) In the Circuit Court of the City of Bristol, Virginia, the defendant was convicted of possession of marijuana with the intent

5

Case 2:10-cr-00084-JRG   Document 312   Filed 03/07/14   Page 5 of 11   PageID #: 899

> to distribute and possession of methylenedioxymethamphetamine on March 23, 2007.
> o) In the Circuit Court of the City of Bristol, Virginia, the defendant was convicted of possession of marijuana with the intent to distribute more than one half ounce, but less than five pounds and possession of cocaine on June 16, 2006.

[Doc. 232, Plea Agreement, ¶ 4].

Kinzer testified at the evidentiary hearing that he "sold marijuana for a living" and began dealing marijuana around December, 2002, first as a transporter for others and then as a seller himself. Kinzer contacted his cousin, Kevin Breckenridge, in Charlotte, about supplying him with marijuana. He and Breckenridge did business "off and on," with Breckenridge initially supplying one to three or four pounds of marijuana at a time. Kinzer drove to Charlotte to pick up the marijuana. After his Virginia conviction in June, 2006, Kinzer began to send others to pick up the marijuana from Breckenridge, apparently doing so during the six months he was in jail. When his probation began on the Virginia conviction, he began to utilize drivers to pick up the marijuana in Charlotte. At some point, "things took a break between [Kinzer] and Breckenridge" and Kinzer had to find other suppliers.

Several of the suppliers found by Kinzer were in Atlanta, Georgia. Among them were "Disco" and "Cowboy," from whom Kinzer purchased marijuana four or five times a year for about four years, usually when Breckenridge could not supply him with marijuana. He also obtained marijuana from "John" and a Mexican named Jorge Gonzales. His main Atlanta supplier was "Dave"/Little D," who began supplying marijuana in 2006. "Dave" became a second consistent supplier of marijuana, in addition to Breckenridge. When Kinzer was arrested in Georgia in 2007, he was in possession of 25 pounds of marijuana he had obtained from

6

"Dave." Kinzer's dealings with "Dave" ceased after the Georgia arrest. The marijuana involved in the 2007 Bristol, Tennessee conviction (date of offense April 1, 2006) also came from "Dave."

According to Kinzer, he was continuously involved in drug dealing from late 2002 through his 2010 arrest, even during periods of incarceration, during which he directed others to carry on the drug business. His main co-conspirator during periods of incarceration was his girlfriend, Sandra Duff. Kinzer directed her activities and gave her instructions from jail. During these periods, Duff maintained the drug business "fully functional." Kinzer made arrangements with suppliers and customers to continue to deal with Duff. Kinzer did not utilize any of the other co-defendants in this case, O'Neal, Light, Lewis, or Moles, prior to 2007.

Kinzer testified that he had never dealt in cocaine or crack until a "short time" before October 16, 2009, the date a search warrant was executed at his business, First Class Auto. During the search two large sandwich bags and a blue baggie containing a total weight of 146.9 grams of crack was located. Kinzer stated that he didn't "mess with crack" before then because he knew the federal penalties and because of his mother's history of crack addiction. However, he had developed a supplier of crack, known to him as "Bean," in Atlanta and gradually overcame his "reservations" about crack. Kinzer, Lewis, and Light made three trips to Atlanta to obtain crack from "Bean" for resale by Kinzer, who personally distributed the crack in gram quantities.

Agent Commons testified that the DEA investigation of Kinzer began at the time of Kinzer's arrest in Georgia. A female subject who was with Kinzer at the time of that arrest was the subject of a methamphetamine case and that aroused Commons's interest. Commons investigated the case through witness interviews and review of money gram records. He eventually identified those named in the first indictment, but could not initially identify

7

Breckenridge, who was only identified after interviews with O'Neal and Moles. Commons learned that crack was coming from Atlanta through interviews with O'Neal, Light and Lewis. Commons considered the Georgia traffic stop to be part of the conspiracy and used the date of that stop, October, 2007, as the beginning date of the conspiracy. During his investigation of the crack conspiracy, the name "Bean" never came up. Commons later interviewed Breckenridge who admitted that be began supplying marijuana to Kinzer in 2009.

The 2012 version of the Guidelines Manual applies to this case. The guidelines provide that a defendant is a career offender if (1) the defendant was at least 18 years old at the time he committed the instant offense of conviction; (2) the instant offensive conviction is a felony that is either a crime of violence or a controlled substance offense; and (3) the defendant has at least two prior felony convictions of either a crime of violence or a controlled substance offense. USSG § 4B1.1(a). There is no dispute here about the first two prongs of § 4B1.1(a). The sole issue is whether Kinzer's prior felony convictions establish the third prong.

USSG § 4B1.2 provides the definitions of the terms used in § 4B1.1. Section 4B1.2 states, in relevant part, that the terms "two prior felony convictions" means "(1) the defendant committed the instant offense of conviction subsequent to sustaining at least two felony convictions of . . . a controlled substance offense . . ., and (2) the sentences . . . are counted separately under the provision of § 4A1.1(a), (b), or (c)." USSG § 4B1.2(c).

Under § 4A1.2, prior sentences "always are counted separately if the sentences were imposed for offenses that were separated by an intervening arrest (*i.e.*, the defendant is arrested for the first offense prior to committing the second offense)." USSG § 4A1.2(a). If there is no intervening arrest, they are counted separately unless charged in the same charging instrument or sentences were imposed on the same day. *Id*. If the prior sentence was imposed after the

8

commencement of the instant offense, but prior to sentencing for the instant offense, then it is counted separately unless it was for conduct that was part of the instant offense. *Id*., app. note 1.

As noted above, Kinzer argues that he is not a career offender here because his prior convictions are related, *i.e*., part of the instant offense, and therefore do not count as prior sentences for the purposes of § 4B1.1(a). "Prior sentence" is a "sentence imposed prior to sentencing on the instant offense, other than a sentence for conduct that is part of the instant offense." USSG § 4A1.2, app. note 1. Further, "[c]onduct that is part of the instant offense means conduct that is relevant conduct to the instant offense under the provisions of § 1B1.3 (Relevant Conduct)." *Id*. The application note specifically references § 4A1.2(a).

Relevant conduct includes all conduct "that occurred during the commission of the offense of conviction, in preparation for that offense, or in the course of attempting to avoid detection or responsibility for that offense," and, for offenses that would be grouped under USSG § 3D1.2(d), "all acts or omissions . . . that were part of the same course of conduct or common scheme or plan as the offense of conviction." USSG § 1B1.3.

"Common scheme or plan" and "same course of conduct" are closely related concepts. A "common scheme or plan" exists where two or more offenses are "substantially connected to each other by at least one common factor, such as common victims, common accomplices, common purpose, or similar *modus operandi*." USSG § 1B1.3, app. note 9. Offenses that are not part of a common scheme or plan may nonetheless be part of the same course of conduct "if they are sufficiently connected or related to each other as to warrant the conclusion that they are part of a single episode, spree, or ongoing series of offenses." *Id*.

To establish "a common scheme or plan," a defendant must show that "his crimes were jointly planned or the commission of one entailed the commission of the other," not that he

9

stumbled into the same government undercover operation . . . on multiple occasions. *United States v. Wimbley*, 349 Fed. App'x 54, 2009 WL 3296504 (6th Cir. 2009) (applying the 2004 Guidelines and citing *United States v. Irons*, 196 F.3d 634, 637 (6th Cir. 1999)). "Three separate drug sales on three different days do not amount to 'a common scheme or plan,' even if the State could have charged the offenses together or consolidated them for trial or sentencing." *Id*. (citing *United States v. Carter*, 283 F.3d 755, 757-58 (6th Cir. 2002)). As noted in *Wimbley*, which was applying the 2004 version of the Guidelines, under the current Guidelines, multiple offenses are not counted as one if they were part of a common scheme or plan; multiple offenses count as one only if they were indicted together or sentenced on the same day, neither of which occurred here. *Wimbley*, 349 Fed. App'x 54 at \*\* 2 (citing USSG § 4A1.2(a)(2) (2007)). *See also United States v. Smith*, 307 Fed. App'x 966, 2009 WL 211819 (6th Cir. 2009).[1]

Under § 4B1.2, Kinzer's prior convictions are counted separately because they were separated by intervening arrests. The arrest for the first predicate offense was on January 14, 2005, [PSR, ¶ 48]. He committed the second predicate offense on April 1, 2007, and was arrested the same day, [PSR, ¶ 50], and he was arrested for the third offense, committed on the same day, on October 11, 2007, [PSR, ¶ 52].[2] Therefore, Kinzer committed the instant offense after two prior felony convictions for controlled substances offenses that are counted separately

---

[1] The Court also notes that the issue raised by Kinzer here falls squarely within the circumstances described in USSG § 1B1.3, application note 8. The application note provides that offense conduct associated with a sentence that was imposed prior to the acts constituting the instant federal offense are not considered part of the same course of conduct or common scheme or plan. The application note provides an example of a defendant who was convicted for the sale of cocaine and sentenced to state prison who, immediately upon release from prison, again sold cocaine to the same person, using the same accomplices and *modus operandi*. Where the instant federal offense charged the latter sale, the offense conduct relevant to the state prison sentence is considered as prior criminal history, not as part of the same course of conduct or common scheme or plan as the offense of conviction. That is precisely the situation which exists in Kinzer's case.

[2] Agent Commons did testify that he considered the October, 2007 conduct to be part of the instant offense of conviction and the indictment in the case charges a conspiracy beginning in October, 2007. Even if the Court does not consider the October, 2007 conviction, the two prior convictions are sufficient for establishing that Kinzer is a career offender under the Guidelines.

under § 4A1.1(a).  *See United States v. Campbell*, 436 Fed. App'x 518, 2011 WL 3792374 (6th Cir. 2011) (citing *United States v. Mosley*, 635 F.3d 859, 864-65 (6th Cir. 2011) (rejecting the defendant's argument that the district court improperly enhanced his Guidelines range under U.S.S.G. § 2K2.1(a) based on his two juvenile adjudications, concluding that the convictions were properly considered because they were separated by an intervening arrest and that "[o]nce the court determines that an intervening arrest separates two offenses, the ***analysis ends there***.")).  (Emphasis added).

Defendant's objection is therefore overruled and the PSR is adopted by the Court. Kinzer's advisory guidelines range was correctly calculated. With a total offense level of 34 and a criminal history category of VI, the advisory guidelines range for imprisonment is 262 months to 327 months. Kinzer has also filed various other objections to the PSR's guidelines calculation. Those objections are rendered moot by the Court's ruling on the career offender objection and are OVERRULED as such.  [*See* Doc. 292 at 1, fn.1].

So ordered.

ENTER:

> s/J. RONNIE GREER
> UNITED STATES DISTRICT JUDGE